INDUSTRIA PANIFICADORA, S.A.,
Inmobiliaria Santa Ana, S.A., and
F.X. Video Club, S.A., Plaintiffs,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 90–1694 SSH.

United States District Court,
District of Columbia.

April 30, 1991.

Douglas B. McFadden, John M. Shoreman, Washington, D.C., for plaintiffs.

Thomas S. Rees, Asst. U.S. Atty., Washington, D.C., for defendant.

OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on the motion of defendant United States of America to dismiss the complaint in the above-entitled action. For the reasons set forth below, defendant's motion is granted, and the case is dismissed.

### Background

In considering a motion to dismiss, the Court must accept as true the factual allegations of plaintiffs' complaint, and any ambiguities must be resolved in plaintiffs' favor. *See Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985). The following facts are taken from the complaint.

Plaintiffs, Industria Panificadora, S.A., Inmobiliaria Santa Ana, S.A., and F.X. Video Club, S.A., have brought this action under the Federal Tort Claims Act (FTCA), 28 U.S.C.A. §§ 2671–2680, and under the Alien Tort Claims Act (ATCA), 28 U.S.C.A. § 1350, to recover damages for property losses.[1] Plaintiffs are corporations organized and existing under the laws of the Republic of Panama, with their principal places of business in Panama City, Panama.

On or about December 20, 1989, United States Armed Forces engaged General Manuel Noriega's Panamanian Defense Force ("PDF") in Panama. The fighting was short-lived. In only a few days, the U.S. Armed Forces had defeated the PDF and caused the removal of General Noriega from power. The U.S. Armed Forces remained in Panama until approximately January 10, 1990. During part of this period, plaintiffs' properties were looted, burned, and destroyed by Panamanian civilians while the PDF, whose duties included the maintainance of public order, was engaged militarily with the U.S. Armed Forces. Attributing their property damages to defendant's alleged negligence, plaintiffs submitted claims to the United States Department of State for compensation. These claims were rejected. Through this action, plaintiffs now seek recovery for damages in the amount of $1,506,823.00.

Plaintiffs assert that the U.S. Armed Forces, by defeating the PDF, assumed the PDF's duty of maintaining public order in the alleged Occupied Zone.[2] Plaintiffs allege that unspecified U.S. personnel in Washington, D.C., breached such a duty by negligently failing to provide adequate numbers of police personnel to maintain public order. (Amended Complaint, paragraph 5.) Plaintiffs assert that they suffered damages as a direct and forseeable consequence of such a decision.

Defendant argues that plaintiffs' action must be dismissed because the Court lacks subject matter jurisdiction under the FTCA

1. In addition, sixteen related cases have been filed. Eleven cases were stayed by the Court's Order of March 14, 1991, pending the resolution of defendant's motion to dismiss in this case. Those cases include the following: Civil Action No. 90–1966; Civil Action No. 90–2264; Civil Action No. 90–2266; Civil Action No. 90–2281; Civil Action No. 90–2405; Civil Action No. 90–2589; Civil Action No. 90–2756; Civil Action No. 90–2823; Civil Action No. 90–2952; Civil Action No. 90–3061; and Civil Action No. 91–118. Subsequent to the issuance of that Order, five more related cases were filed: Civil Action No. 91–495; Civil Action No. 91–596; Civil Action No. 91–887; Civil Action No. 91–925; and Civil Action No. 91–945.

Although the Court stayed those cases for administrative convenience, the Court did review the plaintiffs' arguments in those cases that were briefed, principally in light of the fact that plaintiffs' counsel in some of the cases are different from counsel in the above-captioned case.

*See* Plaintiffs' Motion To Lift Stay, filed in Civil Action No. 90–1966.

2. One disputed issue is whether the United States owed a duty to plaintiffs of maintaining public law and order under the Hague Convention, to which the United States is a signatory. The Hague Convention would apply where Panama was an "occupied territory." Plaintiffs assert that the U.S. Armed Forces displaced the PDF, thus transforming the area in question into an "occupied territory." Defendant maintains that the increase in U.S. military forces in Panama did not displace the authority of the legitimate government in Panama. (Declaration of Richard A. Clarke.) Defendant also denies plaintiffs' assertion that there was a United States policy decision to assume police power functions in Panama. (Declaration of Richard A. Clarke.) Because this action must be dismissed under the discretionary function exception to the FTCA, it is not necessary to address this issue definitively.

and the ATCA. Alternatively, defendant argues that this suit presents a nonjusticiable political question.

## Discussion

### A. Federal Tort Claims Act

The FTCA was designed to render the United States liable for its torts essentially in the same manner and to the same extent as an individual, in like circumstances, under the law of the place where the wrong occurred. *See United States v. Yellow Cab Co.*, 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951). However, liability under the Act does not give rise to carte blanche. The United States is liable only in the manner and to the extent to which it has consented. Although the FTCA "waives the Government's immunity from suit in sweeping language," *id.* at 547, 71 S.Ct. at 402, the waiver is limited by the terms of the Act's exceptions. If a claim falls within any exception to the FTCA, sovereign immunity has not been waived and the court is without jurisdiction to hear the case. *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976).

In its motion to dismiss, defendant argues that several such exceptions bar suit under the FTCA. They are: (1) the foreign country exception (28 U.S.C.A. § 2680(k)); (2) the combatant activities exception (28 U.S.C.A. § 2680(j)); (3) the exception that applies where there is no actionable duty under applicable state law (28 U.S.C.A. §§ 1346(b), 2674); and (4) the discretionary function exception (28 U.S.C.A. § 2680(a)). Because the Court finds that the discretionary function exception applies to this case, the remaining three exceptions need not be addressed.

### 1. Discretionary Function Exception

The discretionary function exception includes:

"[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

28 U.S.C.A. § 2680(a).

This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984). Where that "boundary" lies, however, has been subject to much interpretation by courts, because Congress did not clearly define "discretionary function." [3]

The discretionary function exception articulates a policy of preventing tort actions from becoming a vehicle for judicial interference with decision-making that is properly exercised by other government branches. The exception embodies the separation of powers. *Blessing v. United States*, 447 F.Supp. 1160 (E.D.Pa.1978). The seminal case of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), sets forth a broad interpretation of the exception. In that case, the Court held that the discretionary function exception barred recovery for claims arising from a massive fertilizer explosion. The fertilizer had been manufactured, packaged, and prepared for export pursuant to detailed regulations as part of a comprehensive federal program aimed at increasing the food supply in occupied areas after World War II. *Id.* at 19–21, 73 S.Ct. at 959–60. Not only was the cabinet-level decision to institute the fertilizer pro-

---

**3.** Historically, the discretionary function derives from the considerable body of case law which gives to federal officials an immunity from suits arising out of certain kinds of official acts. The reason most frequently advanced for this immu-nity is the fear that the threat of damage suits would stultify decision-making. *See* Note, *Development in the Law—Remedies Against the United States and its Officials*, 70 HARV.L.REV. 827, 892 (1957).

gram discretionary, but so too were the decisions concerning the specific requirements for manufacturing the fertilizer. *Id.* at 37–38, 73 S.Ct. at 969. The Court stated:

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision there is discretion.

*Id.* at 35–36, 73 S.Ct. at 967–68.

Unfortunately, the "lower court decisions since *Dalehite* do not comprise a particularly coherent body of case law." *Blessing,* 447 F.Supp. at 1172.[4] In determining whether the discretionary function exception applies, some courts have made a distinction between "planning" and "operational" decisions. Such a distinction is confusing because "planning" is seldom one defined stage of an overall operation.[5] "At what point, if any, are programmatic decisions and refinements made at the operational rather than at the planning level?" *Id.* at 1173 n. 19. This question exemplifies the line-drawing problem that lower courts have faced in dealing with the discretionary function exception.

Recently, the Supreme Court clarified the planning/operational distinction. The Court criticised lower courts' interpretation of this matter, stating that they were "perpetuating a nonexistent dichotomy between the discretionary functions and operational activities." *United States v. Gaubert,* —— U.S. ——, ——, 111 S.Ct. 1267, 1275, 113 L.Ed.2d 335 (1991). In *Gaubert,* the United States Court of Appeals for the Fifth Circuit had held that the Federal Home Loan Bank Board and the Federal Home Loan Bank–Dallas had been negligent in carrying out their supervisory activities over certain aspects of a thrift institution's operation and that those actions were not within the discretionary function exception. 885 F.2d 1284 (5th Cir.1989). The Supreme Court reversed, stating that "[d]iscretionary conduct is not confined to the policy or planning level." —— U.S. at ——, 111 S.Ct. at 1275. Rather, "[a] discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policy-making or planning functions." *Id.* at ——, 111 S.Ct. at 1275. Moreover, "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764.

Other recent cases also have defined the nature of the conduct for which the exception is intended to apply. In *Varig Airlines,* the Court held that the Federal Aviation Administration's actions in formulating and implementing a "spot-check" plan

---

4. *Compare, e.g., Monarch Insurance Co. v. District of Columbia,* 353 F.Supp. 1249, 1258–1259 (D.D.C.1973) (planning and implementation of a riot control program for use during civil orders is a discretionary function), *aff'd,* 497 F.2d 684, *cert. denied,* 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974), *with Downs v. United States,* 522 F.2d 990 (6th Cir.1975) (FBI agent's decision on how to handle an airplane hijacking not a protected act of discretion), *and Miller v. United States,* 410 F.Supp. 425 (E.D.Mich.1976) (negligent operation of waterworks protected by discretionary function exception), *modified,* 583 F.2d 857 (6th Cir.1978), *with Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227 (2d Cir.) (negligent operation of airport control tower not a protected act of discretion), *cert. denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1967).

5. The court in *Blessing* summed up this problem, stating "[t]he frontier where planning ends and operations begin ... is seldom sharply marked. Because plans and programs are not often put into effect mechanically, judgments of varying sorts and degrees must be made in taking all but the most reflexive actions. Accordingly, most operations retain some 'planning' elements right up to the final execution." 447 F.Supp. at 1173 n. 19. In *Dalehite,* the Supreme Court similarly recognized that the "planning" function extends beyond the mere "initiation of programs" and "includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." 346 U.S. at 35–36, 73 S.Ct. at 967–68.

for airplane inspection was protected by the discretionary function exception because of the agency's authority to establish safety standards for airplanes. *Id.* at 815, 104 S.Ct. at 2765. Actions taken in furtherance of the program were likewise protected, even if those particular actions were negligent. *Id.* at 820, 104 S.Ct. at 2767. In *Berkovitz v. United States,* 486 U.S. 531, 533, 108 S.Ct. 1954, 1957, 100 L.Ed.2d 531 (1988), the Court examined a comprehensive regulatory scheme governing the licensing of laboratories to produce polio vaccines and the release of particular drugs to the public. The Court found that some of the claims fell outside the exception, but only because the agency employees had failed to follow the specific directions contained in the applicable regulations, and that in those instances, there was no room for choice or judgment. *Id.* at 542–543, 108 S.Ct. at 1961–62. The case was remanded for analysis of the remaining claims in light of the applicable regulations. *Id.* at 544, 108 S.Ct. at 1962. The Court stated: "[A]ssuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function was designed to shield." *Id.* at 536, 108 S.Ct. at 1959.

The nature of the conduct reviewed in *Monarch Insurance Co. v. District of Columbia,* 353 F.Supp. 1249 (D.D.C.1973), *aff'd,* 497 F.2d 684 (D.C.Cir.), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974), is comparable to that of the instant case. In *Monarch,* this court held that the discretionary function exception barred claims challenging the adequacy of troops and police forces assigned in connection with third-party looting following the assassination of Dr. Martin Luther King, Jr. Similarly, in *Smith v. United States,* 330 F.Supp. 867 (E.D.Mich.1971), the court held that the discretionary function exception applied. The plaintiff Smith, who was shot by National Guardsmen during a city riot, alleged negligence on the part of the Secretary of Defense and high-ranking officers of the National Guard and the Army. *Id.* at 868. The court stated:

The means and method of restoring order in a city faced with anarchy and breakdown of civilian authority are delegated to the Executive Branch of the Government, not the judiciary. That some may say with the wisdom of hindsight that the National Guard was not sufficiently prepared to cope with the delicate task of quelling a riot ... does not create a cause of action. It is more appropriately a plea addressed to the legislative and executive branches of the Government.

*Id.* at 869.

█ In addition, it is clear that the discretionary function exception protects military policy judgments. In *Boyle v. United Technologies Corp.,* the Court stated:

We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of [28 U.S.C.A. § 2680(a) ]. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness.

487 U.S. 500, 511, 108 S.Ct. 2510, 2517, 101 L.Ed.2d 442 (1988).

█ The discretionary function exception is clearly applicable to the instant case. This case involves Executive Branch judgments that are grounded in political, military, and foreign policy considerations. Plaintiffs' amended complaint unquestionably challenges Executive Branch decisions concerning the numbers of military personnel to be utilized, their deployment, and the kinds of orders that should be issued in furtherance thereof.

Plaintiffs assert that "[t]he record in this case is admittedly far too preliminary for any positive conclusions at this time, but it is clear that the negligence alleged does not involve the formulation of policy or the performance of any quasi-legislative or judicial functions." (Plaintiffs' Opposition, at 27–28.) The facts show otherwise. In their amended complaint, plaintiffs assert that the "high officials" in Washington

who "planned" the military action were negligent, not the U.S. personnel in Panama that handled the "operational" matters. Plaintiffs assert that this case does not question military strategy or foreign policy decisions by the Executive Branch. Yet they seek to distinguish the decision to undertake military action from the decision on how many military police to utilize in Panama. They do not question the U.S. decision to engage the PDF, but they do question the Executive Branch's decision on how to handle the aftermath of the initial attack. Because both decisions involved planning of the U.S. military operation in Panama, this distinction is unconvincing.

Although plaintiffs urge that the United States has consented to this lawsuit and is liable for negligent acts at the "operational level," the Court concludes that their factual allegations fall squarely within the area of the discretionary function exception.[6]

## B. *Nonjusticiable Political Question*

■ Defendant also argues that plaintiffs' action should be dismissed because it involves a nonjusticiable political question. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). Both the separation of powers doctrine and the policy of judicial self-restraint require that federal courts refrain from intrusion into areas committed by the Constitution to the Legislative and Executive Branches of the Government. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The Supreme Court has defined "nonjusticiability" as "the inappropriateness of the subject matter for judicial consideration." *Id.* at 198, 82 S.Ct. at 700. The Court also has defined those elements that serve to identify nonjusticiable political questions. It has stated:

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217, 82 S.Ct. at 710.

If one of these conditions is inextricable from the case at bar, then adjudication of the case may be said to require resolution of a political question, which is nonjusticiable and hence not reviewable by a court. *Id.* *See also Greenham Women Against Cruise Missiles v. Reagan*, 591 F.Supp. 1332, 1335 (S.D.N.Y.1984). However, while only one of these elements must be present, it must be significant for there to be a nonjusticiable political question. *Baker*, 369 U.S. at 217, 82 S.Ct. at 710. The Court finds that several of the *Baker* elements present themselves in the instant case.

Plaintiffs' allegations fall within the first element discussed in *Baker*. It is well established that decisions pertaining to national security, such as whether and how to use military forces, are entrusted to the

---

6. Plaintiffs also purport to bring this action under the Alien Tort Claims Act, 28 U.S.C.A. § 1350. However, defendant correctly argues that the ATCA is not itself a waiver of the sovereign immunity of the United States. *See* *Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C.Cir.1985). Plaintiffs argue that the waiver is provided by the FTCA. However, because this case falls within the discretionary function

political branches. CONST. Art. II.[7]

In addition, the instant case falls within the second element of *Baker*, because decisions which affect our national security involve policy decisions beyond the scope of judicial expertise. "To attempt to decide such a matter without the necessary expertise and in the absence of judicially manageable standards would be to entangle the court in matters constitutionally given to the executive branch." *In re Korean Air Lines Disaster*, 597 F.Supp. 613, 616 (D.D.C.1984), *aff'd*, 829 F.2d 1171 (D.C. Cir.1987).

The issues of the instant case are comparable to those in *Nejad v. United States*, 724 F.Supp. 753, 754 (C.D.Cal.1989). In that case, plaintiffs brought an FTCA action based upon the Navy's shooting down of an Iranian airliner over the Persian Gulf. Plaintiffs asserted that the political question doctrine should not apply because they did not challenge the President's decision to send warships to the Persian Gulf but only the manner in which the President's decision was carried out by the Navy. The court rejected such a distinction, stating:

> Here, it is indubitably clear that plaintiffs' claim calls into question the Navy's decisions and actions in execution of those decisions. The conduct of such affairs are constitutionally committed to the President as Commander in Chief and to his military and naval subordinates. Thus, the claim here implicates possibly all and at least formulations [1], [4], [5] and [6] of *Baker v. Carr*. Plaintiffs contend that they do not call into question the President's decision to send U.S. warships to the Persian Gulf, but only the negligent manner in which the President's decision was carried out. This contention too must fail.

exception, sovereign immunity has not been waived.

**7.** There is considerable case law in this area. *See, e.g., Haig v. Agee,* 453 U.S. 280, 292, 101 S.Ct. 2766, 2774, 69 L.Ed.2d 640 (1981) (matters closely related to foreign policy and national security rarely proper for judicial intervention); *DaCosta v. Laird,* 471 F.2d 1146, 1154 (2d Cir. 1973) (Article II, § 2 of the Constitution is a "specific textual commitment of decision-mak-

> [T]he same considerations which preclude judicial examination of the decision to act must necessarily bar examination of the manner in which that decision was executed by the President's subordinates. The textual commitment to the President as commander in chief of authority for military decision entails that his decision may be implemented without judicial scrutiny....

*Id.* (quoting *Rappenecker v. United States*, 509 F.Supp. 1024, 1030 (N.D.Cal.1980)).

Similarly, this court in *Monarch* stated that "[p]olicy considerations directly related to objectives which are, in the strictest sense of the term, governmental or political pervade every phase of planning and executing a riot control program. Such considerations point not only to discretionary functions free from liability under the Tort Claims Act but to political questions which are beyond the jurisdiction of this Court." 353 F.Supp. at 1258.

In the instant case, plaintiffs assert that their suit "does not call into question any foreign policy or military decision by the President or any other policy maker in the Executive Branch." (Plaintiffs' Opposition, at 37.) Plaintiffs state that their suit is "for property damages caused by negligence in the exercise of police power." (Plaintiffs' Opposition, at 37.) At the same time, plaintiffs assert that "[t]he negligence on which this action is based is the failure by the United States personnel located in Washington, and in command of the military incursion, to assign sufficient military police after the civil disorders in Panama City occurred." (Plaintiffs' Opposition, at 21.)

Plaintiffs' assertions contradict themselves. The decision on how many military police to assign to Panama was a decision

ing responsibility in the area of military operations in a theatre of war to the President, in his capacity as Commander in Chief"); *United States ex rel. Keefe v. Dulles,* 222 F.2d 390 (D.C. Cir.1954) (responsibility for dealing with foreign nations over the seizure of American property or persons is clearly committed to the President), *cert. denied,* 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 743 (1955).

made by the military. Thus, while plaintiffs carefully worded their amended complaint to suggest a basis in traditional tort concepts of due care and negligence, their allegations implicate broader political questions that encompass U.S. foreign policy and military operations. Any judicial inquiry into the reasonableness of the decisions at issue would require that this Court second-guess Executive Branch decisions, some of which were made while military personnel were engaged in combat. Such an inquiry would be fraught with national security considerations and unmanageable political and military issues. Not only are there no judicially manageable standards for the Court to follow in resolving these issues, but an independent resolution would show a lack of respect due to a coordinate branch. Although plaintiffs contend that this case does not possess those elements set forth in *Baker*, the facts show that plaintiffs' action involves judicial review of executive branch decisions pertaining to the nature, conduct, and implementation of a presidentially-directed military operation in a foreign country. This goes to the heart of the political question doctrine. Therefore, the Court concludes that plaintiffs' claim presents a clear nonjusticiable political question. Because plaintiffs' claims fall within the discretionary function exception to the FTCA and because they present a nonjusticiable political question, the case must be dismissed.[8]

An appropriate Order accompanies this Opinion.[9]

## ORDER

Upon consideration of defendant's motion to dismiss, plaintiffs' opposition thereto, and the entire record herein, for the reasons set forth in the accompanying Opinion, it hereby is

ORDERED, that defendant's motion is granted and the case is dismissed.

SO ORDERED.

---

8. In light of the Court's ruling, and in the interest of efficient administration in the event of an appeal, the Court will lift the stays in the eleven cases set forth *supra* in footnote 1, and simultaneously will dismiss all sixteen related cases for the reasons set forth above.

9. The Court is sympathetic to the circumstances which led to the filing of these related lawsuits; the Court deplores the looting and pillaging by Panamanian civilians which led to the losses plaintiffs have suffered. However, there cannot be a judicially imposed remedy for all wrongs.